IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 22–96–BLG–SPW |
| Plaintiff, | |
| vs. | ORDER |
| RAFE AARON CAMP, | |
| Defendant. | |

On December 5, 2024, Defendant Rafe Aaron Camp filed a motion under 18

U.S.C. § 3582(c)(1)(A) to reduce his 46-month federal drug sentence. (Doc. 41;

*see* Doc. 33 (Judg. Watters).)[1]  The government opposes. (Doc. 44.)  Camp's

projected release date is January 28, 2026. *See* Inmate Locator,

http://www.bop.gov/inmateloc (accessed Mar. 13, 2025).  On March 15, the Court

ordered the government to file Camp's medical records from November 27, 2024

through March 15, 2025. (Doc. 48.)  The government complied. (Doc. 49.)  For

the reasons stated below, the defendant's motion is granted.

---

[1] Camp filed a prior motion under 18 U.S.C. § 3582(c)(1)(A) to reduce his 46-
month federal drug sentence on June 24, 2024. (Doc. 36.)  The Government
responded, arguing that Camp failed to exhaust his administrative remedies as
required before petitioning the court. (Doc. 37.)  Camp filed a motion to withdraw
the prior motion on July 22, 2024, (Doc. 39), which was granted that same day,
(Doc. 40).

ANALYSIS

The First Step Act of 2018 gives district courts wide discretion to reduce an existing term of imprisonment so long as a defendant first seeks relief from the Bureau of Prisons ("BOP") and the reduction: (1) is consistent with the applicable policy statements of the Sentencing Commission, (2) takes into consideration the sentencing factors of 18 U.S.C. § 3553(a), and (3) is warranted by "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A); *United States v. Keller*, 2 F.4th 1278, 1284 (9th Cir. 2021) (per curiam).

Here, Camp argues that BOP's inadequate medical treatment of his various medical issues is an extraordinary and compelling reason that warrants his early release, or alternatively, his home confinement. (Doc. 41 at 5–6.) Because Camp is correct, and the § 3553(a) factors weigh in favor of such a reduction, his motion is granted.

## I.     Exhaustion of Administrative Remedies

A defendant may only file a motion for compassionate release with the district court once he has "fully exhausted all administrative rights to appeal a failure of BOP to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Here, Camp filed a request for relief with the warden at his facility on July 24, 2024. (Doc. 41 at 2–3.) Though

2

BOP does not have a record of this request, Camp's attorney has provided a series of emails that indicate a request for compassionate release was sent to BOP on that date. (Doc. 44 at 3.) More than 30 days have expired since the date listed on the emailed request. Accordingly, the United States waives its objection to the 30-day requirement, (*id.*), and Camp has exhausted his administrative remedies as required by statute.

## II.    Extraordinary and Compelling Reasons

While the First Step Act does not define "extraordinary and compelling reasons, the Sentencing Guidelines provide explicit examples of what constitutes such circumstances. *See* USSG §1B1.13. Relevant here, extraordinary and compelling reasons exist if "[t]he defendant is . . . suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." §1B1.13(b)(1)(B). Extraordinary and compelling reasons also exist if "[t]he defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." §1B1.13(b)(1)(C). The Sentencing Commission also explains that the defendant may additionally "present any other circumstance or combination of circumstances that, when considered by themselves or together

3

with any of the examples provided by the Sentencing Commission, "are similar in gravity to" the examples provided.  § 1B1.13(b)(5).

Camp argues that BOP's inadequate treatment of his medical conditions constitutes an extraordinary and compelling reason for relief under § 1B1.13(b)(1)(B) and § 1B1.13(b)(1)(C).  (Doc. 41 at 5–7.)  Camp argues that BOP is failing to properly treat his hip condition, ear condition, visual impairment, elevated levels of Carcinoembryonic Antigen ("CEA"), and diagnosed paranoid schizophrenia.  As to his hip condition, Camp states that he is in severe pain, unable to walk effectively, and, without surgery, is at risk for permanent damage due to its deterioration, which may include the loss of his leg.  (*Id.* at 5–6; Doc. 47 at 2.)  Regarding his ear, Camp argues that his condition requires immediate medical attention to prevent hearing loss.  (Doc. 41 at 2, 6; Doc. 46 at 3, 10.)  As to his vision, Camp asserts that he has not received eyeglasses to address a vision limitation despite requesting such treatment since October 2023.  (Doc. 41 at 6.)  Regarding his elevated CEA levels, Camp argues that since these levels are typically indicative of cancer, (Doc. 46 at 5–7), any delay in proper diagnosis and treatment could result in serious harm or death.  (Doc. 41 at 6–7; Doc. 46 at 5–6.)  Lastly, as to his diagnosis of paranoid schizophrenia, Camp asserts that he is not receiving any medical treatment.  (Doc. 41 at 5–6.)  Camp, accordingly, argues that the lack of treatment he has received from BOP for his hip condition, hearing and

4

vision issues, elevated levels of CEA, and paranoid schizophrenia create an extraordinary and compelling reason for compassionate relief. (Doc. 41 at 6).

In response, the government argues that Camp fails to establish such an extraordinary and compelling reason for early release because his medical conditions are being adequately addressed by BOP. (Doc. 44 at 10.)

Neither party is completely correct. The medical records provided by BOP begin in December 2022 and end March 2025. (Docs. 45-1, 45-2, 49-1.) While these records show that BOP has adequately addressed Camp's visual impairment, paranoid schizophrenia, and hip condition, the same cannot be said as to his CEA levels and ear condition.

As to his visual impairment, Camp requires glasses and has requested them from BOP since October 2023. In its response, the government acknowledges that Camp "needs glasses[,]" but does not address this issue further. (Doc. 44 at 7.) According to his medical records, Camp was scheduled for an appointment with an optometrist in November 2023, (Doc. 45-2 at 9), but there is no record of that appointment occurring or being rescheduled. Instead, the records only show that Camp failed to appear for three scheduled appointments in November 2023, though it's unclear what type of appointments these were—eye-related or otherwise. (*Id.* at 1–3.) The record does not show any optometry appointments occurred or are scheduled, which suggests that Camp may not have access to

glasses. (*See generally* Docs. 45-1, 45-2, 49-1.) However, Camp did send an email to BOP staff on March 1, 2025, requesting new glasses because his were broken, (Doc. 49-1 at 29), indicating that he did, at some point in time, have glasses. The Devices and Equipment Report provided also suggests that Camp at some point had two pairs of glasses, one personal pair and one from UNICOR. (Doc. 49-1 at 15.) It is clear from the Camp's medical records that his prescription has not been updated since 2016. (Doc. 49-1 at 21–23.)

Though Camp's prescription is severely outdated, and it remains unclear whether he has access to glasses, neither issue would rise to the level of an extraordinary and compelling reason for relief under § 1B1.13(b)(1)(B) or § 1B1.13(b)(1)(C). Camp's visual impairment, which is myopia (nearsightedness), (Doc. 45-1 at 51, 68), is not a "serious physical or medical condition," § 1B1.13(b)(1)(B), and failing to provide Camp with glasses does not put him at "risk of serious deterioration in health or death," 1B1.13(b)(1)(C).

As to his diagnosis of paranoid schizophrenia, Camp argues that he is not receiving medical treatment for this condition. The government responds that his condition is not going untreated, rather his mental health is stable, and he has been unmedicated for two years and for years preceding incarceration. The record shows that during his intake into BOP, Camp filled out a health assessment and history form. (Doc. 45-2 at 104–05.) In the section of the form that inquired

6

"[h]ave you ever had a mental illness?" Camp checked the 'yes' box, and where he could specify further, he wrote, "paranoids." (*Id.* at 105.) In the medication section, he did not list any antipsychotic medications. (*Id.*) Accordingly, it appears that BOP was aware, or should have been aware, of Camp's diagnosis upon his entry into custody and that he was unmedicated at that time. Additionally, on March 1, 2025, Camp emailed a request to BOP staff asking, "Why am i being denied my medication and other needs that are needed for my mental health." (Doc. 49-1 at 30.) However, Camp's medical records show that the only other times he sought psychological treatment within BOP was in the form of the medication assisted treatment ("MAT") program. (Doc. 45-1 at 6, 15; Doc. 45-2 at 7.) As of March 1, 2025, he is still requesting access to the MAT program. (Doc. 49-1 at 30.) Further, at various points during his incarceration, BOP clinic physicians reported Camp's psychiatric state as "within normal limits" or not "mood impaired." (*E.g.*, Doc. 45-1 at 7; Doc. 45-2 at 25, 55.) In September 2024, a BOP nurse practitioner described Camp's mental health as "stable," and noted that he was diagnosed with paranoid schizophrenia five to six years ago at that point, but "has not been on medications for the past two years." (Doc. 45-1 at 15.) In October 2024, the chief psychologist reported "no diagnosis." (Doc. 49-1 at 19.)

Accordingly, without additional information as to how BOP has denied
Camp access to treatment, BOP's management of his diagnosed paranoid
schizophrenia does not constitute an extraordinary and compelling reason for relief
under § 1B1.13(b)(1)(B) or § 1B1.13(b)(1)(C). Though a serious medical
condition, Camp's diagnosis does not appear to diminish his ability to provide self-
care while incarcerated, *see* 1B1.13(b)(1)(B), nor does the necessary care appear to
be lacking or pose a risk of serious deterioration in health or death, *see*
§ 1B1.13(b)(1)(C).

In arguing that his hip treatment is inadequate, Camp relies on a letter from a
doctor, dated prior to Camp's sentencing, which provides that Camp "has a
condition with his right hip that will require surgery" and several months of
rehabilitation and physical therapy. (Doc. 41-1 at 2.) Camp additionally relies on
the expert opinion of Debra DeMint, a registered nurse in Idaho, who opines that
because of his worsening condition, Camp "needs to see a surgeon and have
RIGHT hip surgery scheduled immediately." (Doc. 46 at 3.) Camp was evaluated
by an orthopedic surgeon on September 23, 2024, who recommended that Camp
receive a cortisone injection with fluoroscopy, and stated that if the injection does
not help, then surgery may be helpful. (Doc. 45-1 at 108.) Camp saw a BOP
doctor on October 25, 2024, who recommended a consultation based on the
orthopedic surgeon's treatment plan. (*Id.* at 11.) The doctor set a "target date" of

8

December 31, 2024. (*Id.*)  Although Camp did not receive this injection treatment until February 5, 2025, (Doc. 49-1 at 31), over a month past his target date, he has not reported any issues related to hip pain since receiving the cortisone injection, (*see generally id.*)  Accordingly, Camp appears to be receiving appropriate treatment from BOP such that his hip condition does not constitute a serious medical condition diminishing his ability to provide self-care, § 1B1.13(b)(1)(B), or a medical condition that requires specialized medical care that is not being provided. § 1B1.13(b)(1)(C).  Accordingly, Camp's hip condition fails to qualify as an extraordinary and compelling reason for compassionate release under either § 1B1.13(b)(1)(B) or § 1B1.13(b)(1)(C).

Regarding his CEA levels, Camp received test results in August 2024 that showed these levels as elevated, (Doc. 45-1 at 98), which typically indicates cancer, (Doc. 46 at 5–7).  He argues that a delay in proper diagnosis and treatment could result in serious harm or death.  (Doc. 41 at 6–7; Doc. 42-1.)  The record establishes that following his positive and elevated CEA results in August 2024, (Doc. 45-1 at 25, 26), Camp's treatment plan consisted of "Follow-up at Sick Call as Needed," (*id.* at 25), and a colonoscopy and a consultation with a gastroenterologist were requested, (*id.* at 26).  Camp then failed to appear for multiple lab appointments in November 2024. (*Id.* at 1–5).  The government characterizes this failure to appear as "impeding [] follow-up diagnoses or

9

treatment," (Doc. 44 at 9), while Camp does not address this conduct, (*see generally* Docs. 41, 47). Ultimately, follow-up testing did occur in December and test results showed that Camp's CEA levels remained in the abnormally elevated range. (Doc. 49-1 at 25.) Camp's medical records indicate that the labs were forwarded to a primary care physician, (*id.* at 9), and that a "GI consult [was] previously written," (*id.* at 8). However, there is no indication that further treatment has been arranged to address Camp's abnormal test results. (*See generally id.*)

Accordingly, elevated CEA levels appear to be a medical condition that requires specialized care and could put the defendant at risk for serious deterioration in health or death, §1B1.13(b)(1)(C), and the record shows that BOP is failing to provide Camp with the level of required care. While Camp's own conduct may have delayed his treatment, this does not explain BOP's failure to arrange for Camp to be seen by an appropriate specialist over the four months since his second abnormal test result. Therefore, Camp's elevated CEA levels establish an extraordinary and compelling reason under 1B1.13(b)(1)(C).

Lastly, regarding his ear condition, Camp was prescribed medical drops for his ears intermittently from February 6, 2024, through November 4, 2024. (Doc. 45-1 at 77–78.) On September 11 of that year, Camp saw a BOP nurse practitioner and "[w]hen asked if he completed all of his antibiotics and steroids, [Camp] stated

10

well I haven't been putting the drops in twice a day and my mother told me to stop

taking the prednisone." (Doc. 45-1 at 19–20.) On September 27, 2024, Camp saw

an ear, nose, and throat ("ENT") specialist who identified Camp's conditions as

"[c]hronic mucoid otitis of the left middle ear[,]" "[c]entral perforation of left

tympanic membrane[,]" and "[c]hronic mastoiditis." (Doc. 45-1 at 111–12.) The

ENT reported that these conditions "limit[] daily activities; interfere[e] with work;

[and] interfer[e] with social activities." (*Id.*) She then recommended that Camp

use two medications, and if there was no improvement, then he would need a CT

scan. (*Id.* at 113). On November 20, 2024, Camp underwent a CT scan, which

resulted in an internist finding "left otomastoiditis with possible tegmen tympani

dehiscence." (Doc. 45-1 at 103–04.) Based on the medical records provided by

BOP, Camp did not seek treatment again for another ear infection until March 6,

2025, at which point Camp was provided with refills of the medications

recommended by the ENT. (*Id.*) On March 16, 2025, Camp failed to appear for an

appointment he requested, but it is unclear if the appointment was related to his ear

issues. (Doc. 49-1 at 1.) On March 18, 2025, the BOP generated Camp's

medication administration record, which shows that he missed dosages of his

medications in late March. (Doc. 49-1 at 14.) As of March 26, 2025, Camp is still

actively being prescribed the two medications that treat his ear condition. (*Id.* at

24.) Because Camp's medical records end March 2025, it is unclear whether he

has received any follow up treatment with his ENT, as was recommended. It is also unclear whether Camp is properly taking his medication given his history of noncompliance.

Thus, Camp's ear condition constitutes a serious medical condition diminishing his ability to provide self-care, § 1B1.13(b)(1)(B), and a medical condition that requires specialized medical care, § 1B1.13(b)(1)(C). In her expert opinion, Nurse DeMint emphasizes that "time is of the essence" and the necessity that treatment be provided "within an appropriate timeframe." (Doc. 46 at 3, 10.) Accordingly, it is possible that Camp's ear condition and BOP's care as to that condition qualify as an extraordinary and compelling reason under both § 1B1.13(b)(1)(B) and § 1B1.13(b)(1)(C).

Ultimately, BOP's treatment of Camp's visual impairment, paranoid schizophrenia, and hip condition does not constitute an extraordinary and compelling reason for release. However, BOP has failed to provide the specialized care required to address Camp's elevated CEA. Additionally, it is unclear from his medical records whether the care BOP has provided as to Camp's ear condition is adequate. Accordingly, Camp has established that due to his elevated CEA levels, he "is suffering from a medical condition that requires . . . specialized medical care that is not being provided and without which the defendant is at risk of serious

12

deterioration in health or death," which qualifies as an extraordinary and compelling reason under §1B1.13(b)(1)(C).

## III.   Section 3553(a) Factors

Even if Camp has shown extraordinary and compelling reasons to reduce his sentence, such reduction must also be consistent with the federal sentencing objectives set forth in 18 U.S.C. § 3553(a).  Pertinent factors include the "nature and circumstances of the offense and the history and characteristics of the defendant," the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," to deter criminal conduct and protect the public, and to provide effective correctional treatment, including education or vocational training and medical care.  *See* 18 U.S.C. § 3553(a)(1), (2).  Courts may also consider the advisory guideline range and the need to "avoid unwarranted sentencing disparities" among similarly situated defendants.  *See id.* § 3553(a)(4), (6).

Camp advocates for early release and home confinement which would allow his mother, Deanne Wright, to serve as his primary caregiver.  (Doc. 41 at 7–8.) Camp argues that early release is justified under the § 3553 factors because he understands the seriousness of the offense and because continued punishment is not necessary to afford deterrence to criminal conduct.  (*Id.* at 7.)  Further, Camp argues that he would benefit from the ability to access certain medical facilities for

treatment and surgery and to participate in programming and educational opportunities not currently afforded to him at the BOP facility where he is incarcerated. (*Id.* at 7–8.) The government argues that Camp remains a danger to the community, and his release would undermine each sentencing objective. (Doc. 44 at 10–11.) Ultimately, the Court agrees with Camp.

In 2021, Camp was involved in distributing methamphetamine in the Miles City area. (PSR at ¶¶ 9–17.) Camp's conviction is a result of four controlled buys in which agents obtained 47.9 grams of methamphetamine that ranged between 84-percent and 99-percent pure, which triggered a mandatory, five-year minimum sentence. (*Id.*) However, the statutory safety valve applied, which removed the mandatory minimum, reducing Camp's guideline range from 70 to 87 months to 57 to 71 months. (Doc. 34.) Camp also received a 20-percent downward departure and was sentenced to 46 months in custody. (*Id.*) In the Court's determination that this sentence was sufficient but not greater than necessary, Camp's need for significant mental health and addiction treatment was weighed against the seriousness of his offense, his criminal history, adequate deterrence, and protection of the public. (*Id.*) However, the recent change in Camp's CEA levels indicate a greater need for medical care than that considered at the time of sentencing. Further, Camp's current physical state significantly lessens the likelihood that he would be a danger to the community upon release.

14

On balance, particularly in consideration of Camp's abnormal CEA levels and deteriorated physical state, the § 3553(a) factors support a reduction in Camp's sentence. Though Camp's history and characteristics demonstrate a lack of respect for the law, BOP's inability to provide him with effective medical care, *see* 18 U.S.C. § 3553(a)(2)(d), weighs heavily here.

In 2009, Camp was convicted of Conspiracy to Possess with Intent to Distribute and sentenced to 30 months in custody, followed by five years of supervised release. While on supervised release, Camp was revoked three times over three years. (PSR at ¶ 36.) Additionally, in 2017, Camp was convicted of Escape in the United States District Court for the District of Washington, after he failed to return to his designated residential reentry center in Seattle. (*Id.* at ¶ 38.) Camp's sentence of 46 months properly reflected this history and promotes the protection of the public. However, his elevated CEA levels were not considered at sentencing. These elevated levels, which indicate cancer, were first identified in August 2024 and confirmed again in December 2024, yet BOP has not arranged any specialized treatment for Camp. Effective medical care is not being provided by BOP. *See* 18 U.S.C. § 3553(a)(2)(d). Further, as explained above, Camp's ear condition "limits daily activities," (Doc. 45-1 at 111), and his mobility is restricted due to his hip condition. Thus, Camp requires specialized care that is not being

provided by BOP, and he is in a physical state that lessens the likelihood that he

would, upon release, be a danger to the community.[2]

Accordingly, a sentence reduction is appropriate here.

### CONCLUSION

Accordingly, IT IS ORDERED that the defendant's motion for

compassionate release under 18 U.S.C. § 3582(c)(1)(A), (Doc. 41), is GRANTED.

DATED this 20ᵗʰ day of May, 2025.

Susan P. Watters, District Judge
United States District Court

---

[2] Although his criminal record shows a series of altercations between Camp and his
mother, Deanne Wright, (PSR at ¶¶ 33, 39, 40, 43, 50, 51), and this conduct is
somewhat concerning regarding Camp's proposal of home confinement with his
mother serving as primary caregiver, it is largely mitigated by his limited physical
state.